The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
May 31, 2018

## 2018COA76

**No. 15CA1081, People v. Jaquez — Constitutional Law — Fifth Amendment — Right Against Self-Incrimination; Criminal Law — Pre-Trial Identification**

As a matter of first impression, a division of the court of appeals holds that the admission of statements made during a one-on-one voice identification procedure not preceded by *Miranda* warnings, that the division concludes was a custodial interrogation, violated the defendant's Fifth Amendment right against self-incrimination.

During the custodial interrogation a police agent, without asking the defendant to repeat the words used by the robber, induced the defendant to speak the same words as those used by a robber during a nearby armed robbery. This is in contrast to a voice exemplar typically used in a voice identification procedure

where the defendant is asked to speak the same words spoken by the robber. In that case, no Fifth Amendment violation occurs because the characteristics of a person's voice are not protected by the Fifth Amendment.

Here, the words the defendant chose to utter were admitted and argued by the prosecution as substantive evidence of his guilt. The division concludes that the admission of this evidence inculpated the defendant and violated his Fifth Amendment right against self-incrimination. This error was not harmless beyond a reasonable doubt, requiring reversal of defendant's armed robbery conviction.

The division also concludes that the one-on-one voice identification procedure was impermissibly suggestive and remands to the trial court to make further findings on reliability under *Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002).

Court of Appeals No. 15CA1081
Adams County District Court No. 14CR2305
Honorable John E. Popovich, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Anthony Roger Jaquez,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE BERGER
Hawthorne and Miller*, JJ., concur

Announced May 31, 2018

Cynthia H. Coffman, Attorney General, John T. Lee, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Kamela Maktabi, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1    During a one-on-one voice identification procedure, the victim of an armed robbery was directed by the police to speak with the defendant, Anthony Roger Jaquez, while Jaquez was in custody, to "see if [Jaquez] would say anything to [the victim]." Jaquez was not warned of his Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before this encounter.

¶ 2    Unlike a typical voice identification procedure, Jaquez was not merely asked to repeat the words heard by the victim during the robbery. Instead, Jaquez and the victim had a brief conversation during which Jaquez made statements that were nearly identical to the statements made by the robber. These statements were admitted at his criminal trial as substantive evidence of his guilt.

¶ 3    We must decide whether the admission of those statements violated Jaquez's Fifth Amendment right against self-incrimination. We conclude that the statements should not have been admitted and further conclude that the error was not constitutionally harmless. Accordingly, we reverse Jaquez's conviction and remand for a new trial.

## I.  Relevant Facts And Procedural History

¶ 4    The prosecution's evidence permitted the jury to find the following facts.  At approximately 4:50 a.m., a masked man robbed an Adams County 7-Eleven and its store clerk at gunpoint.  The robber directed the clerk to give him the money in the cash register, and told the clerk that as long as he cooperated, "he wouldn't be harmed."

¶ 5    The clerk gave the robber the money in the cash register — approximately $107, comprised of ten, five, and one dollar bills.  The robber then left the store.  The clerk immediately triggered the store's silent alarm and called 911.

¶ 6    The clerk described the robber as male, wearing a blue bandana over his face, a white hat, black coat, blue jeans, white shoes, and white contact lenses.[1]  When officers arrived on scene, the clerk also told them that he recognized the voice of the robber as the voice of a prior customer.  He said that when the robber told him that he would not harm him, the robber drew out, in an unusual manner, the "h" in the word harm.

---

[1] White contact lenses cover the iris of a person's eye, thus making it difficult (if not impossible) to discern the person's natural eye color.

¶ 7     Roughly ten minutes after the robber left the 7-Eleven, Jaquez was walking north up a hill in the Lamplighter Mobile Home Trailer Park — about six blocks from the 7-Eleven — and came across Paul Harris sitting on his porch. Harris noticed that Jaquez "seemed a bit out of breath, a little sweaty, [and] kind of look[ed] a little tired." The two started a conversation. Jaquez told Harris that he had been in an argument with his cousin, and that his cousin had driven off in their car. Jaquez explained that he lived in Pueblo, and asked Harris if he knew how to get to the nearest Greyhound bus station. Harris did not know where the Greyhound station was, so instead tried to explain how to get to the local bus. However, it became clear to him that Jaquez did not know the area well enough to understand the directions Harris was giving.

¶ 8     Jaquez then asked Harris to give him a ride to the bus stop. Harris initially refused. Jaquez asked again and told Harris that he was willing to pay him. Jaquez pulled a wad of cash out of his pocket, which, according to Harris, contained some ten, five, and one dollar bills. Harris then reluctantly agreed to give Jaquez a ride to the bus stop, but permitted Jaquez to first use his cell phone, his bathroom, and have a drink of water.

3

¶ 9    The two started walking towards Harris's car, but they saw a police car parked on the nearby corner.  For reasons not explained by the record, Harris suggested that they go back to his house and wait until the police left the area.  Jaquez instead suggested that Harris go pick up his car, and then meet him back at Harris's house.  Harris agreed.  As he walked to his car, he was stopped by the police officer.  After some questioning, Harris told the officer about his interactions with Jaquez.

¶ 10    Harris then took officers back to his house where Jaquez was supposed to be waiting.  The officers searched Harris's house and surrounding yard but did not find Jaquez.  While the officers were speaking with Harris outside his house, Harris noticed Jaquez crouched between two cars, and pointed him out to officers.

¶ 11    An officer approached Jaquez, but Jaquez walked away.  The officer told Jaquez to stop, but Jaquez started jogging.  The officer ran after Jaquez and, a short distance away, the officer stopped Jaquez, handcuffed him, and placed him in the backseat of a police vehicle.  At the time, Jaquez was wearing jeans, a black t-shirt, and white shoes; he had $28.58 in his possession.  He did not have a

white hat, blue bandana, white contact lenses, black jacket, or a gun.

¶ 12  Shortly after Jaquez was apprehended, the 7-Eleven clerk was brought to the mobile home park for a show-up identification.  The clerk was unable to make a visual identification because the robber had covered his face and disguised the color of his eyes with white contact lenses.

¶ 13  As an alternative to a visual identification, the police asked the clerk to speak to Jaquez to see if he could recognize Jaquez's voice as the voice of the robber.  Importantly, the police did not ask Jaquez to repeat the words the robber had used during the robbery.  Instead, the officers told the clerk that he did not need to ask Jaquez any questions, but was told "to speak with [Jaquez] and tell him that, listen, I was just robbed and I don't want to see you get in trouble or jammed up if you didn't do this and just see if [Jaquez] would speak with [the clerk]."

¶ 14  At the time, Jaquez was in the backseat of the police vehicle in handcuffs with the window closest to him rolled down.  The clerk stood next to the car and did exactly what the police told him to do: he told Jaquez that he did not want to see him get "jammed up" for

5

something he did not do. Jaquez responded by saying he "wouldn't do anything like that . . . he wouldn't harm him." The clerk immediately walked to the nearest officer and identified Jaquez as the robber. Based on this identification, Jaquez was arrested and charged with aggravated robbery.

¶ 15 Jaquez moved to suppress both the out-of-court voice identification and the statements he made to the clerk during the voice identification procedure. After an evidentiary hearing, the trial court ruled that both would be admissible at trial.

¶ 16 The prosecution also presented testimony by an investigating officer who testified that in watching the surveillance video at the 7-Eleven, he noticed that the robber had a distinct gait. This distinct gait drew the officer's attention to the robber's feet, which led him to notice an unusual crease in the robber's jeans. The officer further testified that he compared a photo of Jaquez's jeans to a still frame from the surveillance video from the 7-Eleven. From this, he concluded that Jaquez had the same unusual crease in his jeans as the robber.

¶ 17 Jaquez was convicted as charged. He appeals, arguing that the trial court erred by (1) admitting the statements made to the

clerk during a custodial interrogation in violation his Fifth Amendment rights; (2) admitting the clerk's one-on-one voice identification because the identification procedure was unduly suggestive and unreliable in violation of his right to due process; and (3) permitting a police officer to give expert opinion testimony when he was not disclosed or qualified as an expert under CRE 702 and Crim. P. 16(I)(a)(1)(III).

## II. Jaquez's Statements Were Admitted in Violation of the Fifth Amendment

¶ 18    Jaquez contends that the trial court violated his Fifth Amendment right against self-incrimination when it admitted the statements he made to the clerk during his voice identification. We agree.

### A. Introduction

¶ 19    In its written order addressing the admissibility of Jaquez's statements, the trial court found that the clerk's colloquy with Jaquez constituted a custodial interrogation under *Miranda*. It also found, with record support, that the clerk was acting as an agent of the state. Nevertheless, the trial court determined that Jaquez's statement, "I would not harm you," made while he was in custody,

7

was admissible because Jaquez was merely asked to repeat the words as spoken by the robber. As a result, the trial court found that the statements were nontestimonial and thus not protected by the Fifth Amendment.

¶ 20 Had Jaquez been directed to say the words said by the robber for the purposes of the voice identification procedure, the trial court's analysis would have been sound and consistent with the Fifth Amendment. But, the record does not support the factual underpinning of the court's analysis.

¶ 21 At trial, the prosecutor introduced the statements both through the clerk and through a police officer who was standing nearby. The prosecutor had the following colloquy with the clerk:

> Q. And what was the response from the individual in the police car when you said --
>
> A. *He said, "I wouldn't harm you."*
>
> Q. What was your reaction when you heard that?
>
> A. *It shocked me because it was exactly the same way, the same words that was* [sic] *said to me when I was being robbed.*
>
> Q. And what, if anything, did you do?
>
> A. I immediately walked back to the back end of the police car, and I said, "That's him."

8

(Emphasis added.)

¶ 22    The prosecutor asked the officer:

> Q. Okay.  So you were nearby?
>
> A. Yes.
>
> Q. And could you hear the conversation between [the clerk] and Mr. Jaquez?
>
> A. Yes.
>
> Q. What did you hear the defendant say?
>
> A. *"I don't mean you any harm."  "I don't mean you no harm."  And because of our prior conversation about that specific verbiage and how unusual that would be said really in general, that was one of the main points of the conversation.*
>
> Q. So that was very noticeable to you when you heard him say that?
>
> A. Yes.

(Emphasis added.)

¶ 23    In its closing argument the prosecution emphasized that during the voice identification procedure Jaquez volitionally used the same words as the robber.

### B.    *Miranda*

¶ 24    *Miranda* enforces a suspect's constitutional right against self-incrimination by prohibiting the admission of statements

9

procured by custodial interrogation, unless the suspect was first advised of his rights. *Miranda*, 384 U.S. at 444. *Miranda*'s safeguards "only apply when a suspect is subject to both custody and interrogation." *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010).

¶ 25     It is uncontested that Jaquez was in custody at the time of the voice identification. The Attorney General contends, however, that either (1) there was no interrogation; or (2) Jaquez's statements were nothing more than a voice exemplar used to identify him, which normally would not constitute a testimonial statement protected by the Fifth Amendment. We address both contentions in turn.

1.     The Clerk was an Agent of the Police

¶ 26     We first note that there was no challenged interrogation *by a police officer*; instead, Jaquez's statements at issue were made to a private citizen, the clerk. Therefore, the Fifth Amendment could only preclude the admission of Jaquez's statement to the clerk if the clerk was an agent of the state. *People v. Robledo*, 832 P.2d 249, 250 (Colo. 1992).

¶ 27    "State action has been extended to include civilians acting as agents of the state in order to prevent law enforcement officials from circumventing the *Miranda* requirements by directing a third party to act on their behalf." *Id.* "The test as to whether a private citizen has acted as an agent of the police for purposes of criminal investigation is whether the person 'in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state.'" *People v. Lopez*, 946 P.2d 478, 481 (Colo. App. 1997) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)).

¶ 28    The trial court found that the clerk was an agent of the state because he was acting at the specific direction of law enforcement officials. The Attorney General does not contend that this finding was clearly erroneous, a concession that is well supported by the record. The clerk only spoke with Jaquez at the direction and request of the police. The police told him what to say, and they stood nearby and listened to Jaquez's response.

¶ 29    "Our role as an appellate court is to review the record to determine whether the trial court's findings of fact are adequately supported by competent evidence and whether the court applied the

11

correct legal standard to these findings in resolving the issue before it." *Robledo*, 832 P.2d at 251. Under these circumstances, the trial court correctly found that the clerk was acting as an "instrument" of the state. *See Lopez*, 946 P.2d at 481-82.

¶ 30     We next turn to whether the clerk's interaction with Jaquez constituted an interrogation within the meaning of the Fifth Amendment.

2.     The Clerk's Colloquy with Jaquez Constituted an Interrogation

¶ 31     A suspect's statement is in response to interrogation if he was "subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Interrogation includes "any words or actions on the part of the police [or their agent] . . . that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

¶ 32     Whether a custodial interrogation occurred is a mixed question of fact and law. *People v. Barraza*, 2013 CO 20, ¶ 15. While we defer to the trial court's findings of historical fact and will not overturn them if they are supported by the record, "we review de

novo the legal question whether those facts, taken together, establish that custodial interrogation occurred." *Id.*

¶ 33     The trial court found that the interaction between the clerk and Jaquez was an interrogation for the purposes of *Miranda*. This conclusion is supported by the record. *See People v. Wood,* 135 P.3d 744, 751 (Colo. 2006). The evidence presented at the suppression hearing indicated that officers directed the clerk to speak to Jaquez. They told the clerk to "just see if [Jaquez] would talk to [him]." The police instructed the clerk to tell Jaquez that he did not want Jaquez to get in trouble if he did nothing wrong — thus inviting Jaquez to make inculpatory (or exculpatory) statements. A reasonable officer directing this interaction should have known that such a statement by the clerk was "reasonably likely to elicit an incriminating response" from Jaquez. *Innis,* 446 U.S. at 301.

¶ 34     We thus conclude that the colloquy between the clerk and Jaquez constituted an interrogation within the meaning of *Miranda* and *Innis*.

### 3. Jaquez's Statements Were Not a Voice Exemplar

¶ 35    The Attorney General nevertheless argues that even if there was a custodial interrogation, the admission of Jaquez's statements did not violate the Fifth Amendment because the underlying purpose and use of the interaction was for the clerk to identify Jaquez's voice, rather than for the substance of what Jaquez said. That is, the Attorney General contends that Jaquez's statements were merely a voice exemplar.

¶ 36    If this were factually accurate, then the statements by Jaquez would not be subject to the Fifth Amendment's protections. "One's voice and handwriting are, of course, means of communication. It by no means follows, however, that every compulsion of an accused to use his voice or write compels a communication within the cover of the [Fifth Amendment] privilege." *Gilbert v. California*, 388 U.S. 263, 266 (1967). As another division of this court has said, "the Fifth Amendment does not protect '[p]articular characteristics of a person's voice,' such as 'tone, accents, or speech impediments.'" *People v. Ortega*, 2015 COA 38, ¶ 28 (quoting *York v. Commonwealth*, 353 S.W.3d 603, 606 (Ky. 2011)).

¶ 37    The question, therefore, is this: Were the words spoken by Jaquez merely a voice exemplar used to identify him, or were they volitional statements used by the prosecution as substantive evidence of his guilt?  We conclude they were the latter.

¶ 38    Had the police (or the clerk) asked Jaquez to repeat the words used by the robber, his Fifth Amendment rights would not have been implicated.  *See Ortega,* ¶ 28.  But here, the clerk was directed to have a conversation with Jaquez to see if he could recognize Jaquez's voice.  The prosecution then used the very words that Jaquez chose to utter in response to this interrogation — and the fact that they were the same words used by the robber — as substantive evidence of Jaquez's guilt.  Jaquez's use of the same words uttered by the robber obviously inculpated him, completely apart from the clerk's voice identification.

¶ 39    Because Jaquez was subject to custodial interrogation and was not given *Miranda* warnings before being subjected to the interrogation, the court violated Jaquez's Fifth Amendment rights by admitting his statements.  Jaquez's conviction can only be

upheld, therefore, if this error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967).[2]

C. The Erroneous Admission of Jaquez's Statements Was Not Constitutionally Harmless

¶ 40    "If a statement obtained in violation of *Miranda* was admitted as part of the prosecution's case-in-chief, over the defendant's objection, reversal is required unless the error was harmless beyond a reasonable doubt." *People v. Frye*, 2014 COA 141, ¶ 6 (quoting *People v. Vasquez*, 155 P.3d 588, 592 (Colo. App. 2006)). Reversal is required if "there is a reasonable possibility that the [error] might have contributed to the conviction." *Chapman*, 386 U.S. at 24 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86-87 (1963)). "[T]he

---

[2] The Attorney General also argues that even if there was a custodial interrogation, Jaquez's statements were made knowingly and therefore were admissible at trial. To the extent we understand this argument, we reject it. Jaquez was not advised of his Fifth Amendment rights before he made the statements, and "unwarned custodial statements, whether or not voluntary, are inadmissible in the 'government's direct case, or otherwise, as substantive evidence of guilt.'" *People v. Trujillo*, 49 P.3d 316, 321 (Colo. 2002) (quoting *United States v. Havens*, 446 U.S. 620, 628 (1980)). The Attorney General's argument appears to address the concept that voluntarily made unwarned statements may be admissible at trial for the limited purpose of impeaching the defendant. *See id.* But, the statements here were admitted in the prosecution's case-in-chief, not as impeachment evidence.

State bears the burden of proving the error was harmless beyond a reasonable doubt." *Hagos v. People*, 2012 CO 63, ¶ 11.

¶ 41    The evidence of Jaquez's guilt (other than his statements to the clerk) consisted of the following:

- the voice identification made by the clerk;

- certain jailhouse phone calls made to Jaquez's family in which he apologized for his mistake;

- an officer's testimony that Jaquez and the robber had the same gait and crease in their jeans;

- Harris's testimony regarding his interaction with Jaquez, including his testimony that he overheard Jaquez say on the phone that he "had the loot"; and

- Jaquez's proximity to the scene of the crime.

¶ 42    While the question is close, we conclude that the prosecution has not met its burden to prove that the erroneous admission of Jaquez's statements was harmless beyond a reasonable doubt. *See id.*

¶ 43    The voice identification and the fact that Jaquez used the same words as the robber were among the most convincing evidence of Jaquez's guilt. Without Jaquez's statements to bolster

the reliability of the identification, it is unclear what weight a finder of fact would assign to the identification alone.

¶ 44    The Attorney General relies heavily on the jailhouse phone calls as overwhelming evidence of Jaquez's guilt. To be sure, the phone calls could be considered by a jury as incriminating evidence. But, Jaquez's statements were ambiguous, at least with respect to the use of a gun. Thus, we do not place the same significance on the phone calls as does the Attorney General, at least in the context of determining whether the constitutional error was harmless beyond a reasonable doubt.

¶ 45    Contrary to the Attorney General's suggestion, the fact that Jaquez was relatively close to the scene of the crime when he was apprehended actually weighs in Jaquez's favor. The defense pointed out at trial that the prosecution did not explain how Jaquez could have disposed of the jacket, hat, bandana, contacts, gun, and most (if not all) of the stolen money in a place where neither the police nor police dogs could find them and still have had enough time to get to Harris's home — roughly six blocks from the 7-Eleven — in ten minutes.

¶ 46     In the end, we conclude that although there was substantial evidence of Jaquez's guilt, there was not overwhelming evidence. We therefore cannot conclude that the guilty verdict was "surely unattributable to the error." *See Blecha v. People*, 962 P.2d 931, 942 (Colo. 1998).  Accordingly, we reverse Jaquez's conviction and remand for a new trial.

### III.    The Voice Identification Procedure was Impermissibly Suggestive

¶ 47     Because the issue may arise on a retrial, we address Jaquez's contention that the admission of the clerk's out-of-court voice identification violated his right to due process because the identification was impermissibly suggestive and unreliable.  We agree that the identification was impermissibly suggestive, and if the prosecution again offers the voice identification on retrial (limited of course by our holding above),[3] the trial court must make findings on the reliability of the identification.

---

[3] On retrial, if the prosecution offers the out-of-court identification, it may properly ask the clerk questions surrounding the identification, as well as the fact that the clerk made a positive identification.  However, the prosecution may not introduce the actual words used by Jaquez during the identification and the fact that they were the same words as those used by the robber.

A. Standard of Review and Applicable Law

¶ 48    We review the constitutionality of pretrial identification procedures as a mixed question of fact and law. *People v. Whittiker*, 181 P.3d 264, 272 (Colo. App. 2006). Thus, we defer to the trial court's findings of fact, but review its legal conclusions de novo. *Bernal v. People*, 44 P.3d 184, 190 (Colo. 2002).

¶ 49    A defendant is denied due process of law if an out-of-court identification is so impermissibly suggestive and unreliable as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* at 192.

¶ 50    In analyzing whether the admission of an out-of-court identification violates a defendant's right to due process, the court must first determine if the identification was impermissibly suggestive. *Id.* at 191. If the defendant has not met this burden, the inquiry ends there and the identification is admissible. *Id.* However, if the court finds the identification procedure to be impermissibly suggestive, "the burden shifts to the People to show that despite the improper suggestiveness, the identification was nevertheless reliable under the 'totality of the circumstances.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

20

¶ 51    "One-on-one showup identifications are not per se violative of

due process, although the procedure is viewed with disfavor

because of its strong potential for unnecessary suggestiveness."

*People v. Theus-Roberts*, 2015 COA 32, ¶ 8 (citing *People v.*

*Mascarenas*, 666 P.2d 101, 109 (Colo. 1983)). "Suggestive

confrontations are disapproved because they increase the likelihood

of misidentification, and unnecessarily suggestive ones are

condemned for the further reason that the increased chance of

misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198

(1972).

¶ 52    But, if the identification procedure is impermissibly

suggestive, the court must then determine if the identification was

nonetheless sufficiently reliable to permit the jury to consider it. In

making that determination, the court must consider: (1) the

opportunity of the witness to hear the suspect at the time of the

crime; (2) the witness's degree of attention; (3) the accuracy of the

prior description of the suspect's voice; (4) the level of certainty

demonstrated at the identification procedure; and (5) the time

between the crime and confrontation. *People v. Holden*, 703 P.2d

603, 605 (Colo. App. 1985) (addressing the reliability of voice identification procedures); *see also Bernal*, 44 P.3d at 192.

B.    Application

¶ 53    At the suppression hearing, the trial court concluded that the one-on-one voice identification was not impermissibly suggestive. This conclusion is not supported by the record and is clearly erroneous. *See People v. Singley*, 2015 COA 78M, ¶ 25.

¶ 54    During the voice identification Jaquez was handcuffed in the back of a police vehicle, with multiple police officers standing near the vehicle. One-on-one showups are viewed with disfavor, even assuming there are no other corrupting influences. But, when "[t]he suggestive elements in [the] identification procedure made it all but inevitable that [the witness] would identify [the defendant]" the identification procedure was impermissibly suggestive. *Foster v. California*, 394 U.S. 440, 443 (1969).

¶ 55    Under the circumstances before us, we conclude that the one-on-one voice identification was impermissibly suggestive. But, as noted above, that does not end the inquiry. Instead, the court must next address the relevant factors under *Bernal* to determine

22

whether the identification was nonetheless sufficiently reliable, and thus admissible. 44 P.3d at 192.

¶ 56 Because of its erroneous determination that the one-on-one show-up identification was not impermissibly suggestive, the trial court did not address all of the *Bernal* factors to determine whether the identification was nevertheless sufficiently reliable to be presented to the jury. On remand, should the prosecution seek to present the identification evidence, the court must make appropriate findings under *Bernal* and determine if the identification was sufficiently reliable to allow it to be presented to the jury. *See id.*; *see also People v. Portley*, 857 P.2d 459, 465 (Colo. App. 1992); *Holden*, 703 P.2d at 605.

IV. Expert Testimony

¶ 57 Jaquez also contends that the trial court erred by allowing a police officer to testify regarding the specific gait of the robber without requiring him to be qualified as an expert. We do not know what evidence will be presented on retrial, and thus do not address this question. Instead, we only note that should the prosecution again offer this testimony, the court must analyze its admissibility

under the principles set forth in *Venalonzo v. People*, 2017 CO 9, a case decided after Jaquez's trial.

## V. Conclusion

¶ 58 The judgment of conviction is reversed and the case is remanded for a new trial at which Jaquez's statements to the clerk during the one-on-one identification procedure must be suppressed.

JUDGE HAWTHORNE and JUDGE MILLER concur.