23CA0091 Peo v Le 03-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0091
Douglas County District Court No. 18CR296
Honorable Theresa Slade, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Peter Viet Le,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE KUHN
Welling and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

---

Philip J. Weiser, Attorney General, Abigail M. Armstrong, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Springer and Steinberg, P.C., Taylor Ivy, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Peter Viet Le, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree assault with a deadly weapon, felony menacing, and two crime of violence sentence enhancers.  We affirm.

I.    Background

¶ 2    We draw the following factual background from the record and evidence that the jury heard at trial.

¶ 3    One evening in March of 2018, police were dispatched to a bowling alley after receiving multiple reports that a person had been shot and that the shooter had fled the scene.  Upon arrival, the responding officers found the victim with gunshot wounds to his chest and left buttock.  Despite these injuries, the victim was conscious and ultimately survived the shooting.

¶ 4    The victim recounted what had happened multiple times, including on the night of the shooting itself and the next day while recovering in the hospital.  He told the police that he had been out bowling with several of his friends, and shortly before closing time he went to return his bowling shoes.  After leaving the shoes on the

counter, he accidentally bumped shoulders with another person[1] but continued to walk back to his bowling lane without apologizing.

¶ 5    The victim stated that while he was walking back, he heard the shooter say something to him.  After the victim turned around and asked the shooter what he had just said, the shooter pulled out a gun and shot the victim in the chest.  As the victim started to run away, the shooter fired another shot, hitting the victim in the left buttock.

¶ 6    The victim described the shooter as a male, "about 5'10["] [tall], Vietnamese, wearing a black hoodie, glasses, and having facial hair (goatee)."  Five days after the incident, the police showed the victim a six-photo array in the hospital.  The victim positively identified Le as the shooter by picking his photo from the array.

¶ 7    The prosecution charged Le with attempted second degree murder, first degree assault with a deadly weapon, felony menacing, and two counts of crime of violence sentence enhancers for using a deadly weapon and causing serious bodily injury in connection with

---

[1] The victim told the police the day after the shooting that he had bumped shoulders with Le.  At trial, however, the victim testified that he had "brushed shoulders with a female."

the crimes.  The jury hung on the attempted second degree murder charge[2] but found Le guilty of the remaining offenses.  The trial court sentenced him to twenty years for the first degree assault and three years for the felony menacing, to be served consecutively in the custody of the Department of Corrections.

## II.    Analysis

¶ 8      On appeal, Le contends that the trial court reversibly erred by (1) denying his motion to suppress the victim's out-of-court photo identification of Le after determining that the identification, although based on an impermissibly suggestive photo array, was sufficiently reliable; and (2) not continuing his trial as a remedy for the prosecutor's discovery violation under Crim. P. 16.  We consider these contentions in turn.

### A.    Reliability of the Out-of-Court Photo Identification

¶ 9      Le contends that the trial court erred by not suppressing the victim's out-of-court photo identification because the identification wasn't sufficiently reliable to overcome the suggestiveness of the photo array.  We disagree.

---

[2] The prosecution later dismissed this charge.

### 1. Additional Background

¶ 10    Before trial, Le moved to suppress the victim's out-of-court photo identification and any subsequent in-person identification based on the photo array on the ground that the array was impermissibly suggestive. After an evidentiary hearing, the trial court determined that the photo lineup was unduly suggestive because although three photos showed facial hair, only Le's photo showed a man with a goatee, which was a feature that matched the victim's description of the shooter.

¶ 11    The court then held a second evidentiary hearing to determine whether the victim's out-of-court identification of Le was reliable despite the suggestive nature of the photo array. Applying the five-factor test from *Bernal v. People*, 44 P.3d 184, 192 (Colo. 2002), the court concluded that the identification was reliable, and therefore, admissible.

¶ 12    The victim then identified Le as his shooter at trial.

### 2. Applicable Law and Standard of Review

¶ 13    "Generally, a witness's in-court identification cannot be based on an earlier, unreliable out-of-court identification." *People v. McCants*, 2021 COA 138, ¶ 16. A defendant is denied due process

4

of law if the out-of-court identification is so impermissibly suggestive and unreliable as to give rise to a very substantial likelihood of irreparable misidentification. *People v. Jaquez*, 2018 COA 76, ¶ 49. Thus, "the results of an impermissibly suggestive identification procedure [are inadmissible] unless the totality of the circumstances demonstrates that the procedure was sufficiently reliable despite its suggestiveness." *McCants*, ¶ 16.

¶ 14　　To determine whether an out-of-court identification based on a photo array is admissible at trial, a court must engage in a two-part analysis. First, a defendant has the burden to prove that the photo array was impermissibly suggestive. *Bernal*, 44 P.3d at 191. If the defendant fails to meet this burden, then no further inquiry is necessary. *Id.*

¶ 15　　But if the defendant proves that the photo array was impermissibly suggestive, then the burden shifts to the prosecution to show that the witness's identification was nonetheless reliable under the totality of the circumstances. *Id.* In considering the totality of the circumstances, courts consider the following factors: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of

the witness's prior description of the defendant; (4) the level of certainty demonstrated by the witness at the time of the confrontation; and (5) the length of time between the confrontation and the crime. *Id.*; *McCants*, ¶ 17. "As long as the totality of the circumstances does not indicate a very substantial likelihood of irreparable misidentification, no constitutional impediment to the admission of the identification testimony exists." *Bernal*, 44 P.3d at 191.

¶ 16 The constitutionality of an out-of-court identification procedure presents a mixed question of fact and law; we defer to the trial court's findings of fact unless they are clearly erroneous and unsupported by the record, but we review de novo its conclusions of law. *McCants*, ¶ 20. However, while the trial court's factual findings are entitled to deference, we may weigh those facts differently and reach a different conclusion than the court. *Bernal*, 44 P.3d at 190. Because Le preserved this issue in the trial court, we review for constitutional harmless error if the court erred, reversing unless we can conclude that any error was harmless beyond a reasonable doubt. *Hagos v. People*, 2012 CO 63, ¶ 11; *see also People v. Martinez*, 2015 COA 37, ¶ 10.

### 3. The Trial Court Didn't Err by Determining that the Out-of-Court Photo Identification Was Sufficiently Reliable

¶ 17 As an initial matter, the parties don't dispute that the photo array used here was impermissibly suggestive. Instead, the parties' dispute revolves around the reliability of the out-of-court photo identification that the victim made five days after the shooting. In concluding that the identification was reliable under the *Bernal* test, the trial court made the following findings:

- The victim had the opportunity to view the shooter at the time of the incident because "[t]he lights in the bowling alley were on," the victim "was 'leaning in' to the shooter," his "view of the shooter was unobstructed," and "they were facing each other."

- Though the victim had "watched the shooter pull the gun from his waistband," that happened late in the encounter. Before the gun was drawn, the victim was trying to hear what the shooter had said.

- The victim was able to provide a detailed description of the shooter shortly after the incident.

7

- The victim's description matched the shooter's appearance in the still photos that video surveillance cameras captured on the night of the incident.

- The victim's description of the shooter had remained "fairly consistent" throughout the proceedings.

- While the victim "appear[ed] to be under the influence of pain medication" at the time of the photo lineup, "he was coherent," "thinking clearly," and was ninety percent sure that Le was the shooter.

- The police administered the photo lineup only five days after the shooting.

¶ 18 In making the above findings of fact, the trial court primarily relied on the victim's testimony at the second suppression hearing. Le doesn't dispute that the court's findings are supported by the record, and thus, must be afforded deference by us. *See McCants*, ¶ 20. However, he argues that we should nonetheless reach a different conclusion than the trial court based on those findings because the court failed to consider certain evidence when evaluating the first four prongs of *Bernal's* reliability test. We're not persuaded.

¶ 19    First, Le contends that in addressing whether the victim had an opportunity to view the shooter at the time of the incident, the trial court didn't consider the victim's testimony that he was "standing eight feet away from the shooter," nor did it acknowledge "just how brief" their encounter was, "[twenty] to [thirty] seconds *at most.*" But contrary to Le's argument, the victim's testimony about the length of his encounter with the shooter and the distance between the two of them doesn't weigh against the reliability of the identification. The fact that the victim faced his assailant for around twenty seconds from eight feet away provided an ample opportunity for observation, and it certainly wasn't clear error for the trial court to reach this conclusion based on the evidence presented. That is especially true given that the victim also testified that the area where the shooting occurred was well-lit, his view was unobstructed, and he had made eye contact with the shooter. *See People v. Campbell*, 2018 COA 5, ¶ 58 (upholding an identification as reliable when a witness saw the suspect for "one or two seconds in a well-lit area while [they] were about ten feet away from one another"); *see also Archuleta v. Kerby*, 864 F.2d 709, 712 (10th Cir. 1989) (stating that a witness had a sufficient opportunity to observe

the defendant when the witness "had two brief, unobstructed views" of the defendant from "thirty to forty feet away").

¶ 20    Second, Le asserts that in assessing the degree of the victim's attention, the trial court (1) failed to consider that the victim "had consumed three beers and felt tipsy when he encountered the shooter" and (2) "disregarded the evidence indicating that [the victim's] attention during the brief encounter would have been focused on the gun instead of the shooter."

¶ 21    But while the victim told the police that he had consumed three beers and felt tipsy shortly before he was shot, he also stated that he was "definitely not drunk." Regardless, evidence regarding the victim's level of intoxication alone is insufficient to invalidate the reliability of his identification. *See Jennings v. State*, 626 S.E.2d 155, 158 (Ga. Ct. App. 2006) (concluding that a photo identification was reliable when the victim, despite being intoxicated at the time of the crime, had ample opportunity to see the defendant, provided a good description of the defendant, and picked the defendant's photo without hesitation).

¶ 22    As for Le's second assertion, the court did recognize that the victim also paid attention to the gun but rejected Le's argument

that the presence of the gun necessarily diverted the victim's attention from the shooter's face to his weapon. In doing so, the court noted that the victim was able to provide a detailed description of the shooter shortly after the incident, suggesting that the victim's focus wasn't on the gun. The victim's testimony further supports the court's finding. He acknowledged that the gun briefly attracted his attention but later clarified that he had only "quickly glance[d]" at the gun and was otherwise looking at the shooter during their encounter.

¶ 23    Third, Le argues that the trial court erred in evaluating the accuracy of the victim's prior description of the shooter because the court "misconstrued" expert testimony regarding the cross-race effect in eyewitness identifications. Specifically, at the second suppression hearing, an expert on the effect of race on facial recognition testified that this case implicated the cross-race effect because the victim and Le were of different races. The expert described the cross-race effect as "the idea that when people are trying to recognize a face, they're usually very good with faces of the same racial group but they may have much more difficulty with faces of different racial groups." The court determined that the

cross-race effect didn't undermine the reliability of the victim's identification because the victim "was one of the only witnesses who did not use a generic 'Asian male' description, instead identifying his shooter as 'Vietnamese.'"

¶ 24     In challenging this finding, Le argues that just because the victim generally described the shooter as Vietnamese doesn't automatically mean that he later correctly identified the specific Vietnamese person who shot him. That's true as far as it goes. But as the court observed, the victim accurately described much more than the shooter being Vietnamese, providing details "such as facial hair, [the shooter's] approximate height, and clothing he was wearing." And the victim's description of the shooter, as the court also observed, is supported by the video surveillance footage.

¶ 25     Finally, we also disagree with Le's argument that the level of certainty the victim exhibited at the time of identification weighs in favor of unreliability because "the trial court did not acknowledge that [the victim] believed [that] another person in the photo array could have been the shooter." While the victim picked another photo in the array as a possible shooter, he positively identified Le with a ninety percent certainty in the accuracy of his identification.

And Le cites no authority — nor are we aware of any — holding that this prong of the *Bernal* test requires absolute certainty. *Cf. Campbell*, ¶ 59 (observing that the victim's "confidence in the identification was high" when the victim was ninety-five percent sure that his identification was accurate).

¶ 26 In sum, we conclude that the trial court didn't err by determining that, under the totality of the circumstances, the victim's out-of-court photo identification was reliable even though it was based on an unduly suggestive photo array. Consequently, the court also didn't err when it denied Le's motion to suppress the photo-lineup identification and any subsequent in-court identification.

B. Motion to Continue Due to an Alleged Discovery Violation

¶ 27 Le next contends that the trial court reversibly erred by denying his motion to continue the trial on the ground that the prosecutor committed a discovery violation. We again disagree.

1. Additional Background

¶ 28 Four days before the start of the trial, in September 2022, Le filed a motion for a continuance, arguing that the prosecutor had untimely disclosed certain information in violation of Crim. P. 16.

Specifically, he alleged that only the day before, the prosecutor had disclosed a transcript of the victim's testimony from December 2019 in Douglas County Case No. 19CV30236. In that case, the victim sued Le for the personal injuries caused by the shooting.[3] Le argued to the trial court that the victim's testimony in the civil case was inconsistent with the victim's prior statements regarding the shooting. He requested an ex parte hearing to explain to the court why that testimony was material to his defense.

¶ 29    The trial court addressed Le's motion on the first day of trial. It observed that the prosecutor's failure to timely disclose the transcript didn't implicate a "discovery issue" because that information was readily available, even more so to Le than the prosecutor, considering that Le was a party to the civil case and the People weren't. The court further observed that Le's prior criminal defense counsel had requested the transcript from the civil case before the prosecutor did. Under those circumstances, the court said that it couldn't find that Le didn't have the information until

---

[3] We take judicial notice of the contents of the court records in this related civil case. *See People v. Sa'ra*, 117 P.3d 51, 56 (Colo. App. 2004).

14

the prosecutor's disclosure. Finally, the court reasoned that a continuance wasn't warranted because the case had been continued several times in the past, and the court had "warned both the prosecution and the [defense] that this [trial] setting was a firm setting." Accordingly, the trial court denied Le's motion to continue.

### 2. Applicable Law and Standard of Review

¶ 30    Rule 16 governs discovery in criminal proceedings, outlining the pretrial procedures that parties must follow. The rule requires a prosecutor to make certain materials and information in her possession or control available to the defense. As relevant here, those include "[a]ny books, papers, documents, photographs or tangible objects held as evidence in connection with the case." Crim. P. 16(I)(a)(1)(IV). The prosecutor must satisfy this obligation "as soon as practicable" but not later than twenty-one days after the defendant's first appearance. Crim. P. 16(I)(b)(1).

¶ 31    In addition, under Rule 16(I)(a)(2), a prosecutor is also required to disclose information in her possession or control that is (1) exculpatory or favorable to the defendant and (2) material to the case. *See People v. Bueno*, 2018 CO 4, ¶ 29; *People v. Dist. Ct.*, 790

15

P.2d 332, 337 (Colo. 1990) (stating that this provision is grounded in the due process requirements the Supreme Court identified in *Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *In re Att'y C*, 47 P.3d 1167, 1170-71 (Colo. 2002) ("[T]he materiality standard of *Brady* . . . applies to Rule 16 disclosures in Colorado.").

¶ 32    If a prosecutor fails to comply with the rule, then the trial court may remedy the discovery violation by ordering the prosecutor "to permit the discovery or inspection of materials not previously disclosed, *grant[ing] a continuance*, prohibit[ing] the [prosecutor] from introducing in evidence the material not disclosed or enter[ing] such other order as it deems just under the circumstances." Crim. P. 16(III)(g) (emphasis added). "Discovery sanctions serve the dual purposes of protecting the integrity of the truth-finding process and deterring prosecutorial misconduct." *People v. Zadra*, 2013 COA 140, ¶ 15, *aff'd*, 2017 CO 18.

¶ 33    "We review both a [trial] court's resolution of discovery issues and its decision to impose sanctions for discovery violations for an abuse of discretion." *People v. Mendez*, 2017 COA 129, ¶ 32. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, unfair, or based on a misapplication of the

law.  *People v. Herrera*, 2012 COA 13, ¶ 11.  It is the appellant's duty to present a record demonstrating any claimed error.  *People v. Ullery*, 984 P.2d 586, 591 (Colo. 1999).

¶ 34     Because Le preserved this issue in the trial court, we review his claim for harmless error.  *See Hagos*, ¶ 12.  We will reverse under this standard only if the trial court's error substantially influenced the verdict or impaired the fairness of the trial.  *Id.*

### 3. The Trial Court Didn't Reversibly Err by Denying Le's Motion for a Continuance

¶ 35     Le contends that the prosecutor's failure to timely disclose the transcript of the victim's testimony in the civil proceeding was a discovery violation that the trial court should have sanctioned by continuing his trial.  In advancing this argument, Le relies on Rule 16(I)(a)(1)(IV) for the proposition that because the transcript contained testimony regarding the shooting — and was in the prosecutor's possession or control — the prosecutor was required to disclose it earlier "regardless of whether Mr. Le could have accessed the transcript as a party to the civil case."  Under these circumstances, he argues, the court abused its discretion by determining that the prosecutor didn't commit a discovery violation

17

that would warrant continuing the case. We discern no reversible error.

¶ 36　It's questionable whether Rule 16 required the prosecutor to affirmatively disclose the transcript of the victim's testimony in the civil case under these circumstances. As the trial court pointed out, Le was a party to that case and his prior defense counsel not only requested the transcript before the prosecutor did but also told the prosecutor about it in the first place. But we need not decide whether the prosecutor violated Rule 16.

¶ 37　Even if we were to assume, for the sake of argument, that the prosecutor committed a discovery violation under Rule 16, Le fails to carry his burden of showing how he was prejudiced by the trial court's decision not to continue his trial. *See People v. Short*, 2018 COA 47, ¶ 54. Le asserts that because the prosecutor provided the transcript of the victim's inconsistent statements only a few days before the trial, he didn't have ample opportunity to investigate those statements and prepare his defense "fully and meaningfully."

¶ 38　But as the People point out, the transcript underlying Le's claim wasn't admitted into evidence or filed in the trial court, it isn't part of the appellate record, and it doesn't appear to be a part of

any filing in the civil case. Because we have no access to that document, we can't confirm its contents, see whether it says what Le claims it does, or evaluate how it could have impacted his trial.[4]

¶ 39 True, the trial court did note during the continuance hearing that it "c[ould] find that there's information in the transcript which would be helpful to defense in preparing their defense." However, we disagree with Le's argument that the quoted language was the court's finding of fact that the transcript was favorable to him. The record shows that the court didn't review the transcript before making this statement. Instead, the court simply accepted as true defense counsel's description of the transcript's contents before denying Le's motion to continue because he "certainly had" the transcript and the court had already granted numerous continuances in the past. In other words, the court assumed for the sake of argument that even if the transcript contained information that would perhaps assist Le in preparing his defense,

---

[4] Likewise, to the extent Le argues that this issue implicates a violation of Crim. P. 16(I)(a)(2), we can't determine from the incomplete record whether the untimely disclosed transcript contained *exculpatory* information that was *material* to this case. *See People v. Bueno*, 2018 CO 4, ¶ 29 (listing elements of a *Brady* claim).

continuing his trial was nonetheless inappropriate under the circumstances. And in any event, whether or not the trial court perceived the transcript as favorable to Le doesn't change the fact that it is not available for our review.

¶ 40 Without the transcript, we can't evaluate whether or to what extent the victim's testimony in the civil case was indeed inconsistent with his prior statements. And we can't resolve whether the trial court's decision not to give Le additional time to investigate that issue substantially influenced the verdict or affected the fairness of the trial proceedings.[5] *See Hagos*, ¶ 12. As the appellant in this case, it was Le's duty to provide an adequate record demonstrating that the trial court erred by not continuing his trial, *see Ullery*, 984 P.2d at 591, and to show that he suffered harm as a result of that ruling, *see Short*, ¶ 54. Because we can't determine from the record before us whether Le suffered any harm due to the alleged error, he fails to carry that burden.

---

[5] Indeed, Le's appellate briefing also doesn't identify any statements in the transcript that were inconsistent with the victim's earlier statements, and he doesn't explain the significance of any inconsistencies.

¶ 41 Under these circumstances, then, we conclude that the trial court didn't reversibly err by denying his motion for a continuance.

## III. Disposition

¶ 42 The judgment is affirmed.

JUDGE WELLING and JUDGE SCHUTZ concur.